# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### ATHENS DIVISION

| | |
|---|---|
| **MEDICAL BUYERS GROUP LLC d/b/a INTEGRITY,** | |
| *Plaintiff,* | **CIVIL ACTION NO.** |
| **v.** | **3:25-cv-00105-TES** |
| **CANDICE PENCE,** *et al.,* | |
| *Defendants.* | |

## ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS IN PART

Before the Court are Defendants Candice Pence ("Candice"), Lisa Pence ("Lisa"), and P4 Biologix, LLC's ("P4") Motions to Dismiss. [Doc. 30]; [Doc. 31]. The Court held a hearing on November 18, 2025, to hear arguments on these motions. [Doc. 51]. Upon review of the oral arguments and the Motions, the Court **GRANTS** them in part.

## LEGAL STANDARD

During the Court's November 18 hearing, P4, Lisa, and Plaintiff Medical Buyers Group LLC d/b/a Integrity ("Integrity") disagreed over the precise legal standard applicable here. In their Motions, the parties argue dismissal under both Federal Rule of Civil Procedure 12(b)(2) and (6). Fed. R. Civ. P. 12(b)(2), (6). These provisions have different standards.

1.    **The 12(b)(6) Standard**

Through Rule 12(b)(6), a defendant may "test the facial sufficiency" of a complaint by way of a motion to dismiss. *Ghee v. Comcast Cable Commc'ns, LLC*, No. 22-12867, 2023 WL 3813503, at *2 (11th Cir. June 5, 2023) (quoting *Brooks v. Blue Cross & Blue Shield*, 116 F.3d 1364, 1368 (11th Cir. 1997)). Such a "motion is an 'assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint still fails as a matter of law to state a claim upon which relief may be granted.'" *Barreth v. Reyes 1, Inc.*, No. 5:19-cv-00320-TES, 2020 WL 4370137, at *2 (M.D. Ga. July 29, 2020) (citation omitted). However, a complaint will survive a Rule 12(b)(6)-based motion if it alleges sufficient factual matter (accepted as true) that states a claim for relief that is plausible on its face. *McCullough v. Finley*, 907 F.3d 1324, 1333 (11th Cir. 2018) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009)).

Whether a complaint states a claim for relief is measured by reference to the pleading standard of Federal Rule of Civil Procedure 8—a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *Barreth*, 2020 WL 4370137, at *2 (citation omitted). Rule 8 doesn't require detailed factual allegations, but it does require "more than unadorned, the-defendant-unlawfully-harmed-me accusations." *McCullough*, 907 F.3d at 1333 (citation omitted) (alterations adopted). Its sole purpose is to provide a defendant "with 'fair notice' of the claims and the 'grounds' for entitlement to relief." *Barreth*, 2020 WL 4370137, at *2 (citation

omitted); *Twombly v. Bell Atl. Corp.*, 550 U.S. 544, 555–56 (2007). When ruling on a motion under Federal Rule of Civil Procedure 12(b)(6), it is a cardinal rule that district courts must accept the factual allegations set forth in a complaint as true. *Twombly*, 550 U.S. at 572. In accepting the factual allegations as true, courts are to construe the reasonable inferences from them in the light most favorable to a plaintiff. *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998).

Therefore, to decide whether a complaint survives a motion to dismiss, courts use a two-step framework. *McCullough*, 907 F.3d at 1333 (citation omitted). The first step is to identify the allegations that are "no more than conclusions." *Id.* (quoting *Iqbal*, 556 U.S. at 679). "Conclusory allegations are not entitled to the assumption of truth." *Id.* After disregarding the conclusory allegations, the second step is to "assume any remaining factual allegations are true and determine whether those factual allegations 'plausibly give rise to an entitlement to relief.'" *Id.* "A court decides whether [Rule 8's pleading standard] is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow [it] to reasonably infer that [a] plaintiff [may be] entitled to the legal remedy sought." *Barreth*, 2020 WL 4370137, at *2 (citation omitted).

When drafting a complaint, "[a] plaintiff must plead more than labels and conclusions or a formulaic recitation of the elements of a cause of action." *McCullough*, 907 F.3d at 1333 (quoting *Twombly*, 550 U.S. at 555). A plaintiff may use legal

conclusions to structure a complaint, but they *must* "be supported by factual allegations." *Id.* (quoting *Iqbal*, 556 U.S. at 679). While courts, in ruling on a 12(b)(6)-based motion, must take all the factual allegations in a complaint as true, they are not bound to accept a legal conclusion couched as a factual allegation. *Iqbal*, 556 U.S. at 678. Courts must "identify conclusory allegations and then discard them—not 'on the ground that they are unrealistic or nonsensical' but because their conclusory nature 'disentitles them to the presumption of truth.'" *McCullough*, 907 F.3d at 1333 (quoting *Iqbal*, 556 U.S. at 681).

Finally, the issue to be decided when considering a motion to dismiss "is necessarily a limited one." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) *overruled on other grounds by Davis v. Scheuer*, 468 U.S. 183 (1984). The issue is not whether the claimant will ultimately prevail, but "whether the claimant is entitled to offer evidence to support the claims." *Id.* The factual allegations in a complaint "must be enough to raise a right to relief above the speculative level" and cannot "merely create[ ] a suspicion of a legally cognizable right of action." *Twombly*, 550 U.S. at 555. A complaint that tenders "'naked assertions' devoid of 'further factual enhancement'" will not survive against a motion to dismiss. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (cleaned up). To survive, a complaint must allege enough facts "to raise a reasonable expectation that discovery will reveal evidence" supporting a claim. *Twombly*, 550 U.S. at 556.

2.    **The 12(b)(2) Standard**

"[A] plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." *N. Am. Sugar Indus., Inc. v. Xinjiang Goldwind Sci. & Tech Co.*, 124 F.4th 1322, 1333 (11th Cir. 2025) (internal quotations omitted). "When a defendant challenges personal jurisdiction in a Rule 12(b)(2) motion to dismiss, the district court must hear and decide the issue before trial unless the court orders a deferral until trial." *AcryliCon USA, LLC v. Silikal GmbH*, 985 F.3d 1350, 1364 (11th Cir. 2021) (internal quotations omitted). When, as here, there has been no evidentiary hearing, "the district court must apply a prima facie standard." *Wooten v. LaSalle Management Company LLC*, No. 7:22-cv-00148 (WLS), 2025 WL 961435, at *2 (M.D. Ga. Mar. 31, 2025) (internal quotations omitted). However, "[e]ven under the prima facie standard, a defendant challenging jurisdiction may submit affidavit evidence in support of its position." *Id.* (internal quotations omitted).

When the defendant actually does challenge jurisdiction with affidavit evidence, like here, "the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction." *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1257 (11th Cir. 2010) (internal quotations omitted). Plaintiff meets its burden "if it

presents enough evidence to withstand a motion for judgment as a matter of law."[1] *AcryliCon*, 985 F.3d at 1365. "Where the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff." *Id.*

### 3.    <u>The Two Standards Compared</u>

In sum, for the parties' substantive arguments under Rule 12(b)(6), the Court looks *only* to the complaint. After throwing out conclusory allegations, the Court considers all factual allegations in the complaint as true to see whether Integrity has adequately pled a claim for relief.

For the parties' procedural arguments under Rule 12(b)(2), the Court considers the complaint, responses, and affidavit evidence. Because Defendants have challenged Integrity's jurisdictional claims with affidavits, Integrity has the burden of proving jurisdiction to a summary judgment standard—more than a mere scintilla of evidence. The Court construes disputed or conflicting facts in Integrity's favor.

---

[1] The phrase "scintilla of evidence" was mentioned several times at the November 18, 2025, hearing. Since that phrase is in the standard for judgment as a matter of law, the Court reproduces that standard to err on the side of clarity. In a motion for judgment as a matter of law, "[t]he non-moving party must provide more than a mere scintilla of evidence to survive . . . If the non-moving party failed to make a showing on an essential element of his case with respect to which he had the burden of proof," granting a motion for judgment as a matter of law is appropriate. *Handley v. Werner Enterprises, Inc.*, 655 F. Supp. 3d 1348, 1361 (M.D. Ga. 2023), *aff'd*, No. 23-10587, 2023 WL 6628921 (11th Cir. Oct. 11, 2023) (quoting *Webb-Edwards v. Orange Cnty. Sheriff's Off.*, 525 F.3d 1013, 1029 (11th Cir. 2008). Therefore, here, Integrity must provide more than a scintilla of evidence.

## FACTUAL BACKGROUND

1.    **In the Complaint**

In its Amended Complaint [Doc. 26], Integrity alleges that it is a small, family-owned business that has been involved in the sale of platelet-rich plasma ("PRP") and related products for eight years. [*Id.* at ¶ 17]. During its business, Integrity has accrued confidential information such as client lists, manufacturer information, supplier information, and training information. [*Id.* at ¶ 19].

Candice was a full-time employee of Integrity from February 2019 to on or about May 27, 2025. [*Id.* at ¶ 20]. She was the Director of Sales.[2] [*Id.*].  As the Director of Sales, Candice received sales commissions. [*Id.* at ¶ 23]. From April 13, 2024, to August 4, 2024, Candice received $92,160.40 in commission, and from August 5, 2024, to March 27, 2025, she received $291,064.72. [*Id.* at ¶¶ 24–25]. Candice handled "sensitive company and product information, including . . . the names, location, and contact information of potential customers, and sales or purchase history and information of all sales clients[.]" [*Id.* at ¶ 26]. She also handled "the names, location, contact information, manufacturing capabilities, product lines, pricing lists, and logistic procedures of many or all manufacturers, manufacturing agents, suppliers, logistic companies, and suppliers of

---

[2] Specifically, Candice's responsibilities included "acting as a sales agent; demonstrating or instructing on product use; presenting products to potential customers or clients; communicating with potential and existing customers; managing potential and actual customer communication channels . . . negotiating and entering into sales agreements . . . ." [Doc. 26, ¶ 22].

goods and inventory to Plaintiff[.]" [*Id.* at ¶ 28]. This information, too, is not generally known by others. [*Id.* at ¶ 29].

While working for Integrity, Candice executed two non-disclosure agreements ("First Agreement" and "Second Agreement") (together, "Agreements"). [*Id.* at ¶¶ 31, 38]. Candice executed the First Agreement on May 18, 2021. [*Id.* at ¶ 31]. It prevented her from disclosing Integrity's private information—among other things—for a period of five years from the date it was executed. [*Id.* at ¶ 31]; [Doc. 26-1, ¶ 6]. The First Agreement reads in relevant part:

> The parties hereto . . . shall not, in any manner solicit and/or accept any business from sources that have been made available by and through the parties hereto, nor in any manner shall access, contact, solicit and/or conduct any transaction with such said sources, without the express and specific written permission of the party who made such said sources available.

> The Parties shall maintain complete confidentiality regarding each other's business and/or their affiliates and shall only disclose knowledge pertaining to these specifically named Parties as permitted by the concerned Party . . . . [3]
> . . .
> The Parties shall not in any way whatsoever circumvent, avoid and/or by-pass each other and/or attempt such circumvention, avoidance of by-passing of each other and/or any of the parties involved in any of the transactions the Parties wish to enter and to the best of their abilities shall ensure that the original transaction codes, data and proprietary information which are disclosed are not altered. [4]
> . . .
> The Parties shall not disclose or otherwise reveal any contact revealed by

---

[3] [Doc. 26-1, ¶ 1].

[4] [Doc. 26-1, ¶ 2].

either Party to any third parties as they fully recognize such information and contact(s) of the respective Party, and shall not enter into direct and/or indirect offers, negotiations and/or transaction with such contacts revealed by the other Party who made the contact(s) available. Such non-disclosure shall include, but not be limited to, the contact's identity, name, address, e-mail address, domain name, telephone numbers, facsimile numbers, bank codes, account numbers, financial reference or other identifying information.[5]

A year later, on August 5, 2022, Candice executed the Second Agreement. [Doc. 26, ¶ 38]. The Second Agreement governed Candice's actions during her time at Integrity and for 12 months after the end of her employment. [Doc. 26-2, ¶¶ 1(c), 2(c)]. The Second Agreement contains a Non-Competition section, a Nondisclosure or Use section, and an Employee Acknowledgments section. [Doc. 26-2, ¶¶ 1, 2, 3]. These sections read, in relevant part:

> During the term of employment, the Employee will perform for Company such duties as it may designate from time to time and will devote my full time and best efforts to the business of Company and will not, without the prior written approval of the chief executive of the Company engage in any other professional employment or consulting, or (b) directly or indirectly participate in or assist any business which is a current or potential supplier, customer, or competitor of Company.[6]
> . . .
> During the term of employment with Company (whether or not during business hours), the Employee will not engage in any activity that is in any way competitive with the business or demonstrably anticipated business of Company, and will not assist any other person or organization in competing or in preparing to compete with any business or demonstrably anticipated business of Company.[7]

---

[5] [Doc. 26-1, ¶ 3].

[6] [Doc. 26-2, ¶ 1(a)].

[7] [Doc. 26-2, ¶ 1(b)].

. . .

> During the terms of employment and for 12 months after the Employee's relationship with the Company has been terminated for any reason, the Employee will not work as a contractor, employee, officer, director, partner, consultant, agent, owner, founder, or engage in any other capacity with a company that competes, has competed, or intends to compete with Company by manufacturing distributing, or selling products or providing services similar in nature to the Products and Services provided by Company.[8]

. . .

> "Confidential Information" includes all information related to any aspect of the Company's business which is either information not known by actual or potential competitors of Company or is proprietary information of Company, whether of a technical nature or otherwise. Confidential Information includes inventions, disclosures, processes, systems, methods, formulae, devices, patents, patent applications, trademarks, intellectual properties, instruments, materials, products, patterns, compilations, programs, techniques, sequences, designs, research or development activities and plans, specifications, computer programs, source codes, costs of production, prices or other financial data, volume of sales, promotional methods, marketing plans, lists of names or contact information of customers or personnel, lists of suppliers, business plans, business opportunities or financial statements.[9]

During the seven years Candice was employed by Integrity, she regularly communicated with Lisa, her mother-in-law. [Doc. 26, ¶¶ 45, 46]. Lisa is the registered owner of P4, and "has been since its formation[.]" [*Id.* at ¶ 59]. Mark Pierce of Cloud Peak Law, LLC, is P4's registered agent. [*Id.* at ¶ 70]. On November 7, 2023, the domain name P4BIOLOGIX.com was registered. [*Id.* at ¶ 57]. On April 13, 2024, non-party Andrew Pierce submitted an application to the Wyoming Secretary of State's Office for

---

[8] [Doc. 26-2, ¶ 1(c)].

[9] [Doc. 26-2, ¶ 2(a)].

the registration of P4 on behalf of P4. [*Id.* at ¶ 67]. The application was granted. [*Id.*]. Also on April 13, 2024, P4 hired Andrew Pierce's nonparty company, Wyoming LLC Attorney, LLC, to provide office services such as answering the phone and taking orders. [*Id.* at ¶ 69]. In May of 2024, P4 contracted non-party Bipper Media, LLC—"a website development firm located in Athens, Georgia"—to create its website. [*Id.* at ¶ 74]. Candice and/or Lisa are registered as the point of contact for P4 on various websites including YouTube.com, Medium.com, Vimeo.com, Facebook.com, Instagram.com, Pinterest.com, TikTok.com, Threads.com, Letterboxd.com, TopGoogle.com, ProvenExpert.com, golocalclassified.com, and USA Jobs Online. [*Id.* at ¶¶ 75, 79].

On August 5, 2024, P4 announced via Instagram that it was "actively selling PRP Products." [*Id.* at ¶ 76]. At the time of Integrity's Amended Complaint, P4's profiles said that its team had 70 years of experience, and that it had sold 11,000 units. [*Id.* at ¶ 78]. The PRP Products P4 sells are similar to those sold by Integrity. [*Id.* at ¶ 81].

### 2.    **Affidavit Evidence**

In support of their Motion to Dismiss, Defendants P4 and Lisa submitted a declaration from Lisa. [Doc. 31-2]. There, she stated that she is the sole owner and member of P4. [*Id.* at ¶¶ 2, 6]. She has used her former nursing background to connect with old co-workers and peers for P4's networking and sales. [*Id.* at ¶¶ 4–5]. Candice has never been an employee or agent of P4. [*Id.* at ¶¶ 6–7]. Lisa, not Candice, manages and maintains P4's website. [*Id.* at ¶ 9]. P4 does not specifically target Georgia in its

advertisements, nor is it registered to do business in Georgia. [*Id.* at ¶¶ 8, 10]. In fact, P4's principal place of business is Ohio. [*Id.* at ¶¶ 2, 6]. P4 has only made 46 sales in its history and has not turned a profit. [*Id.* at ¶ 12].

In response to P4 and Lisa's Motion to Dismiss, Integrity submitted two affidavits of its own. [Doc. 47-1]; [Doc. 47-2]. The first is from nonparty Linda Hardin, the owner and manager of Integrity. [Doc. 47-1, ¶ 2]. Linda trained Candice, who had no knowledge of PRP products before working for Integrity. [*Id.* at ¶ 3]. Candice had access to information that was limited for other employees. [*Id.* at ¶ 5]. Candice created her own list of client information on a non-company computer. [*Id.* at ¶ 6]. When she departed Integrity, Candice stated she planned to sell wellness patches. [*Id.* at ¶ 10]. A visual examination of P4's PRP kits reveals they are similar to those sold by Integrity. [*Id.* at ¶ 12].

Second is the affidavit of nonparty Hannah Hardin, an owner and account representative of Integrity. [Doc. 47-2, ¶ 2]. Hannah conducted internet searches in May of 2025 that indicated a connection between Candice and P4. [*Id.* at ¶¶ 4–5]. On August 15, 2025, Hannah received a notification that Candice, now a former employee of Integrity, had logged into her Integrity Zoom account. [*Id.* at ¶ 6]. In her opinion, P4's products and social media are like those of Integrity. [*Id.* at ¶¶ 8–11]. Candice had access to customer information and created her own list of customer information on a personal computer. [*Id.* at ¶¶ 12–15].

<u>**DISCUSSION**</u>

Before discussing the parties' motions, the Court pauses to first address Count 2. At the November hearing, counsel for Integrity consented to dismissing Count 2. Accordingly, the Court **GRANTS** Defendants' motions as to Count 2 at the outset, and **DISMISSES** Count 2—Plaintiff's Civil Conspiracy for Misappropriation of Trade Secrets claim. [Doc. 26, p. 31].

Now, Defendants filed two separate Motions to Dismiss. [Doc. 30]; [Doc. 31]. In her Motion to Dismiss, Candice argues that Integrity failed to assert claims upon which relief may be granted. [Doc. 30, p. 1]. Specifically, Candice argues that Integrity failed to "support its claims of misappropriation of trade secrets with sufficient factual allegations," asserts that Candice breached a "nonexistent fiduciary duty" to Integrity, "pursues claims that are preempted by the Georgia Trade Secrets Act," asserts claims under unenforceable contract provisions, and asserts "baseless" civil conspiracy claims. [*Id.*]. In their Motion to Dismiss, P4 and Lisa argue that the Court lacks personal jurisdiction over them, and, alternatively, that the counts brought against them fail to state a claim upon which relief can be granted. [Doc. 31, p. 1]. The Court addresses each of Defendants' arguments in turn.

**1.    <u>Candice Pence</u>**

The November hearing made it clear that Integrity has more information than it included in its Amended Complaint, specifically regarding Candice. *See* [Doc. 47-1];

[Doc. 47-2]. Integrity argued information outside of its Amended Complaint during the hearing, and counsel for Candice pointed out that much of Integrity's argument wasn't in the Amended Complaint. Since this is a motion to dismiss, the Court must consider Integrity's Amended Complaint as it was written when it was filed and disregard Integrity's arguments at the hearing that go beyond the Amended Complaint.

Furthermore, during the hearing, Integrity responded to the Court's questions about several of its assertions with the argument that it has sufficiently pled—with the information available at this early stage—enough information for the Court to draw reasonable inferences. *See* [Doc. 46, p. 2]. In other words, the plausibility standard. To put it bluntly, Integrity's Amended Complaint is a close call, even considering the plausibility standard's low bar. However, the Court draws reasonable inferences in Integrity's favor as it must and addresses each of its claims against Candice below.

### a.    Count 1: Misappropriation of Trade Secrets

First, Candice argues that the Court should dismiss Integrity's trade secrets claims under both the Georgia Trade Secrets Act ("GTSA") and the Defend Trade Secrets Act ("DTSA") because Integrity failed "to allege sufficient facts to support entitlement to relief as to either the existence of information that qualifies as a trade secret under applicable law or any act of misappropriation." [Doc. 30, p. 6]; 18 U.S.C. § 1836 *et seq.*; O.C.G.A. § 10-1-760 *et seq.*

To establish a claim under the DTSA and GTSA, Integrity must first show that it

had a protectable trade secret. The DTSA and GTSA define a trade secret similarly.

*Subscriber Holdings, LLC v. Brightstar Corp.*, No. 21-12985, 2022 WL 18034431, at *2 (11th

Cir. Dec. 30, 2022). Specifically, under the DTSA, "trade secret" means:

> all forms and types of financial, business, scientific, technical, economic, or engineering information . . . if– (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3). Also, under the DTSA, the alleged trade secret must be related to

interstate commerce. 18 U.S.C. § 1836(b)(1). Under the GTSA, a trade secret is

information "not commonly known by or available to the public[,]" and "(A) derives

economic value . . . from not being generally known to . . . other persons who can obtain

economic value from its disclosure or use; and (B) Is the subject of efforts that are

reasonable under the circumstances to maintain its secrecy." O.C.G.A. § 10-1-761(4).

Therefore, to plead a trade secret, Integrity must show that it possessed certain kinds of

information that gained value from not being generally known, and that Integrity made

reasonable efforts to protect the privacy of that information. Furthermore, Integrity

must fulfil the DTSA's interstate commerce requirement.

Integrity has sufficiently pled a trade secret at this stage. "Determining whether a

trade secret exists is a fact-intensive inquiry." *AmNet Esop Corp. v. CrossCountry Mortg.,*

*Inc.*, No. 2:23-cv-10-RWS, 2023 WL 9181488, at *10 (N.D. Ga. Dec. 18, 2023); *see also*

*Subscriber Holdings*, 2022 WL 18034431 at *3. Looking to Integrity's Amended Complaint, what exactly are its alleged trade secrets? To use Integrity's words, "[t]he trade secrets at issue [are] customer lists, supplier relationships, and proprietary business methods." [Doc. 26, ¶ 11]. More specifically, Integrity pled that Candice was privy to—what Integrity terms—"Customer Information" and "Supplier Information." [*Id.* at pp. 12–13].  Customer Information is Integrity's list of the "names, location, and contact information of potential customers;" and the "sales or purchase history and information of all sales clients of [Integrity]." [*Id.* at ¶ 26]. Supplier Information includes the "names, location, contact information, manufacturing capabilities, product lines, pricing lists, and logistic procedures of many or all manufacturers . . . ." [*Id.* at ¶ 28].

Customers are not trade secrets and "knowledge on the part of the employee concerning the names and addresses of customers is *not* the property of the employer." *Amnet Esop Corp.*, 2023 WL 9181488 at *11. At the same time, "'a list of actual or potential customers' may constitute a trade secret if, in addition to satisfying [the requirements of the GTSA and DTSA], it is 'not commonly known by or available to the public.'" *Advanced Data Processing, Inc. v. Hill*, No. CV 216-043, 2016 WL 1529906 (S.D. Ga. Apr. 14, 2016) (internal citations omitted); *see also AmNet Esop Corp.*, 2023 WL 9181488 at *10. "[I]t is only the tangible customer list that is the property of the party and warrants protection as a trade secret[.]" *Advanced Data Processing*, 2016 WL 1529906, at *7. The distinction lies in the form of the information and its availability to the public.

But even that distinction is not always dispositive. "[E]ven if all of the information is publicly available, a unique combination of that information, which adds value to that information, also may qualify as a trade secret." *Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1291 (11th Cir. 2003). Once again, it's a fact-intensive inquiry. *AmNet Esop Corp.*, 2023 WL 9181488, at *10. To be clear, the Court will analyze the pleadings at this stage of the litigation to determine whether a trade secret exists as plead.

With that said, the Court begins its analysis with the clearest guideline from caselaw: a customer list is protectable, but the knowledge an employee acquires about customers is not. So, has Integrity sufficiently pled the existence of a customer list? In short, yes, despite Integrity's admittedly inconsistent definition of its trade secrets. In defining trade secrets, Integrity directly lists "customer lists" and uses that language elsewhere in its Amended Complaint. [Doc. 26, ¶¶ 11, 19, 86]. But, Integrity does not directly include "customer lists" in its definition of Client Information elsewhere in the Amended Complaint.[10] [Doc. 26, ¶ 26]. All of this is notably different from the list of "Confidential Information" in the Second Agreement. [Doc. 26-2, ¶ 2(a)]. Drawing reasonable inferences in Integrity's favor, though, Integrity's definition of Client Information reads as a more detailed list of what's included in "customer lists."

Furthermore, Integrity "expend[ed] a great deal of time [and] effort . . . in

---

[10] It does, however, include "the names, location, and contact information of potential customers, and sales or purchase history and information of all sales clients[.]" [Doc. 26, ¶ 26].

developing the list[.]" *Tanium Inc. v. Yago*, No. 1:21-cv-1867-MHC, 2021 WL 5033452, at

*11 (N.D. Ga. July 28, 2021). Specifically, Integrity alleged that "in operating its PRP

Products business, [Integrity] has assembled, accrued, or developed substantial

confidential information related to manufacturer information, supplier information . .

. ." [Doc. 26, ¶ 19]. Although Integrity's allegations about the effort, timeline, and

process of acquiring such information are admittedly vague, they are enough at this

stage to establish that "[s]uch information . . . is the result of [Integrity's] long-term

efforts to collect, retain, and protect the information." *Tanium Inc.*, 2021 WL 5033452 at

*11. Therefore, Integrity has sufficiently pled a customer list as a trade secret.

      The Court cannot stop at customer lists, though. Integrity has also alleged that its

Supplier Information is a trade secret. Like Customer Information, Integrity's pleadings

regarding Supplier Information are inconsistent. Integrity listed "supplier

relationships" as a trade secret, but later defined "Supplier Information" as "the names,

location, contact information, manufacturing capabilities, product lines, pricing lists,

and logistic procedures of many or all manufacturers, manufacturing agents, suppliers,

logistics companies, and suppliers of goods and inventory to [Integrity.]" [Doc. 26, ¶¶

11, 28]. To start, "the identity of product manufacturers and suppliers is not generally

considered to be a trade secret." *Sciele Pharma, Inc. v. Brookstone Pharms., LLC*, No. 1:09-

CV-3283-JEC, 2010 WL 9098290, at *9 (N.D. Ga. June 23, 2010) (internal citations

omitted); *see also Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1298–99

(11th Cir. 2018) (finding a district court did not err in holding that a seller's identity is not a trade secret). Furthermore, while a "supplier relationship" doesn't qualify as a trade secret, pricing lists do. After all, a rival company could use the prices given to Integrity to negotiate a similar or better deal from the same manufacturer. Therefore, Integrity has sufficiently pled protectable supplier information as a trade secret at this stage.

Next, Integrity did not address in its Response whether its trade secrets derive economic value from not being generally known. [Doc. 46]. So, the Court compiled Integrity's allegations in its Amended Complaint regarding the economic value of the alleged trade secrets. They are as follows. "The trade secrets at issue . . . derive independent economic value from not being generally known." [Doc. 26, ¶ 11]. "Plaintiff . . . has assembled, accrued, or developed substantial confidential information . . . that has economic value to the business." [*Id.* at ¶ 19]. "The aforementioned Client Information . . . has monetary and strategic value to Plaintiff . . . ." [*Id.* at ¶ 27]. "The aforementioned Supplier Information . . . has monetary and strategic value to Plaintiff . . . ." [*Id.* at ¶ 29]. Integrity also describes its confidential information as "valuable." *See* [*Id.* at ¶¶ 61, 62(d)]. "Plaintiff's Trade Secrets . . . derive independent economic value from their secrecy . . . ." [*Id.* at ¶ 91].

Integrity's direct assertions are insufficient. Some are bare recitations of the language of the DTSA. *Compare* [*Id.* at ¶¶ 11, 91], *with* 18 U.S.C. § 1839(3)(B). Plaintiff's

other assertions fail to show that the information "derives" its value "from not being

generally known." 18 U.S.C. § 1839(3)(B). However, as stated above, the Court draws

reasonable inferences in Integrity's favor under the plausibility standard. With that in

mind, Integrity pled that "[t]he misappropriations by Defendants provide P4 Biologix

with a competitive and operational advantage in developing, importing, marketing, and

selling products materially similar or identical to those of Plaintiff, targeting Plaintiff's

existing customers, and diverting Plaintiff's business opportunities." [Doc. 26, ¶ 94].

Therefore, the Court can infer that the value the confidential information derives "from

not being generally known" to competitors is the market niche Integrity carved out for

itself. So, drawing what is undoubtedly a far-reaching inference in Integrity's favor,

Integrity has sufficiently pled that its trade secrets derive value from not being

generally known.

Finally, Integrity's assertions that it has taken reasonable steps to protect the

privacy of its confidential information are barebones, barely meeting minimal

standards. Specifically, Integrity alleged that its trade secrets "are subject to reasonable

measures to maintain their confidentiality, including the use of restricted access,

confidentiality agreements, and employee non-disclosure provisions." [Doc. 26, ¶ 91].

That is the only place in its Amended Complaint that Integrity specifically lays out its

protection protocols. Elsewhere, it leaves that inference up to the Court once again. For

example, Integrity states that "Candice Pence . . . acquired and retained access to

significant confidential and proprietary information of Plaintiffs . . . ." [*Id.* at ¶ 49].

Presumably, Candice had to acquire and retain access to the information because it was

not available to all employees. Again, Integrity's Amended Complaint contains many

gaps that forced the Court to fill in with reasonable inferences. However, here, the

existence of the two Agreements, along with the "restricted access" to information that

Candice had to "acquire[] and retain[]" is minimally sufficient to establish reasonable

steps to protect the privacy of the information. *See FTI Consulting, Inc. v. Secretariat

Advisors, LLC,* No. 1:24-cv-1356-TWT, 2025 WL 756024, at *9 (N.D. Ga. Mar. 7, 2025).

Finally, Integrity is a business that sells PRP products to customers "across the

United States and world[.]" [Doc. 26, ¶ 18]. Integrity's trade secrets are related to its

PRP products. 18 U.S.C. § 1836(b)(1). Therefore, the DTSA's interstate commerce

requirement is satisfied.

Since there are protectable trade secrets, Integrity must next plead

misappropriation. Misappropriation comes in three forms: misappropriation by

acquisition, disclosure, or use. Specifically, misappropriation is either "acquisition of a

trade secret of another by a person who knows or has reason to know that the trade

secret was acquired by improper means," or "disclosure or use of a trade secret of

another without express or implied consent by a person who: (i) used improper means

to acquire knowledge of the trade secret . . . ." 18 U.S.C.A. § 1839(5); O.C.G.A. § 10-1-

761(2). "In this case, the surrounding circumstances, namely the [Agreements], clearly

gave rise to a duty on the part of [Candice] to maintain the secrecy of any [Integrity] trade secrets." *Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1292 (11th Cir. 2003).

Integrity has failed to plead misappropriation by acquisition. Integrity has not alleged anything about *how* Candice acquired the confidential information beyond it being the "skill [s]he [acquired]," the "knowledge [s]he [obtained]," and "all the information [s]he [received]" during her employment with Integrity. *Diamond Power Int'l, Inc. v. Davidson,* 540 F. Supp. 2d 1322, 1338 n.13 (N.D. Ga. 2007). Integrity pled that Candice had access to certain information during her employment. [Doc. 26, ¶¶ 26, 28]. But, Integrity has not pled how Candice wrongfully acquired any trade secrets from that access. Candice is allowed to "take with [her]" the skills, knowledge, and information she gained during her employment with Integrity. *Diamond Power,* 540 F. Supp. 2d at 1338 n.13.

Similarly, Integrity failed to plead misappropriation by disclosure. As with acquisition, Integrity has not alleged how Candice disclosed its confidential information. Integrity merely alleged that "Candice Pence provided Lisa Pence with said confidential information . . . ." [Doc. 26, ¶ 54]. And, "Lisa Pence and Candice Pence, in furtherance of said Agreement, assembled, shared, and communicated Plaintiff's confidential information . . . ." [Doc. 26, ¶ 55]. However, these conclusory allegations do not satisfactorily allege that Candice actually disclosed trade secrets or how she did so.

But, Integrity has properly plead misappropriation by use. "[T]he bar for what counts as 'use' of a trade secret is generally low." *Compulife Software, Inc.*, 959 F.3d 1288, 1313 (11th Cir. 2020); *Penalty Kick Mgmt. v. Coca Cola Co.*, 318 F.3d 1284, 1292 (11th Cir. 2003) ("[A]ny exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a 'use.'") (quoting Restatement (Third) of Unfair Competition § 40 cmt. c (1995)). Integrity has alleged that "Candice Pence . . . used Plaintiff's confidential information—Supplier Information and Client Information—to organize and operate Defendant P4 Biologix, LLC to sell PRP Products in direct competition with Plaintiff." [Doc. 26, ¶ 58]. Furthermore, "Candice Pence . . . began using the misappropriated information—Manufacturer Information—to identify, contact, and contract with manufacturers supplying equipment to Plaintiff, to order inventory from said manufacturers and arranging for logistics related to said products." [Doc. 26, ¶ 60]. That is sufficient to meet the low bar here. Integrity's allegations are more specific than general categories, and are more than mere legal conclusions of the standard for misappropriation. Integrity has sufficiently pled the existence of trade secrets and their misappropriation at this stage.

Therefore, Candice's Motion to Dismiss Integrity's GTSA and DTSA claims is **DENIED**. Count 1 survives to the discovery phase.

### b.    Integrity's remaining state law claims

As discussed above, Count 2 is dismissed. That leaves Integrity's Breach of Duty

of Loyalty claim, Breach of Contract claims for both Agreements, Civil Conspiracy for

Breach of Fiduciary Duty claim, and Civil Conspiracy for Breach of Contract claim. In

her Motion to Dismiss, Candice addresses the Breach of Duty of Loyalty claim, and then

groups the two Breach of Contract claims and the two Civil Conspiracy claims together.

The Court does the same.

      The GTSA preempts Integrity's Breach of Duty of Loyalty claim. Integrity alleges

that Candice had a duty to act in the best interest of Integrity and to not compete with

Integrity, but she breached that duty. [Doc. 26, pp. 33–34]. The GTSA "supercede[s]

conflicting tort, restitutionary, and other laws of this state providing civil remedies for

misappropriation of a trade secret." O.C.G.A. § 10-1-767(a). GTSA's preemption is

broad. "[T]he Georgia Supreme Court has made clear that the breadth of the Act's

preemption is such that even in the absence of a finding [of trade secrets], there is no

basis for alternative forms of relief." *Meyn America, LLC v. Tarheel Distributors, Inc.*, 36 F.

Supp. 4d 1395, 1408 (M.D. Ga. 2014). "[T]he key inquiry is whether the same factual

allegations of misappropriation are being used to obtain relief outside the GTSA." *Id.*

(citing *Robbins v. Supermarket Equip. Sales, LLC*, 290 Ga. 462, 466–67 (2012)).

      Integrity argues that its "duty of loyalty claim is not dependent solely on

whether the Client and Supplier Information constitute trade secrets." [Doc. 46, p. 11].

But Integrity's argument is irrelevant because, as stated above, the GTSA's preemption

does not depend on whether Integrity's information is a trade secret. *Meyn America*, 36

F. Supp. at 1408. Integrity further argues that "[t]he claim rests on C. Pence's competing conduct during employment; assisting in forming and launching a competing venture; diverting opportunities and customers; and breaching her obligation to devote full efforts to Integrity under her employment agreements." [Doc. 46, p. 11]. However, the conduct Integrity argues is not differentiable from the misappropriation of trade secrets claim. Integrity's Breach of Duty of Loyalty claim—Count 5—is just seeking a remedy "for misappropriation of a trade secret." O.C.G.A. § 10-1-767(a).  Therefore, it is preempted and **DISMISSED**.

Next, one of Integrity's Breach of Contract Claims survives Candice's Motion to Dismiss. Candice argues that both Agreements are unenforceable under the Georgia Restrictive Covenants Act ("GRCA"). [Doc. 30, p. 14]; O.C.G.A. § 13-8-50 *et seq*. The GRCA requires restrictive contracts be "reasonable in time, geographic area, and scope of prohibited activities[.]" O.C.G.A. § 13-8-53(a). The burden is on Integrity to "plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant." § 13-8-55. If Integrity adequately establishes "that the restraint is in compliance with the provisions of [§ 13-8-53]," the burden passes to Candice to show that the "contractually specified restraint does not comply with such requirements or that such covenant is unreasonable." *Id*. Therefore, "to be enforceable, a Georgia law restrictive covenant must generally be both reasonable and supported by a legitimate business interest." *HOA Franchising, LLC v. MS Foods, LLC,* No. 1:23-cv-04096-ELR, 2023

WL 9692401, at *10 (N.D. Ga. Dec. 20, 2023). Finally, the GRCA allows a court to modify an unenforceable contract to make it enforceable. § 13-8-54. However, that modification is limited to "severing or removing any part of it that is unreasonable," not "rewrite[ing] the restrictive covenant by supplying new and material terms." *Brown v. Yazdi*, No. 1:24-cv-02203-WMR, 2025 WL 3125023, at *7 (N.D. Ga. Aug. 6, 2025) (first citing *Hamrick v. Kelley*, 260 Ga. 307, 308 (1990), then citing O.C.G.A. § 13-8-51(11)).

For the First Agreement, Candice argues that its provisions are "wholly unlimited as to scope of specific prohibited activities and geographic area[,]" and are therefore unenforceable. [Doc. 13, p. 15]. Furthermore, Candice argues that the Court should decline to modify the First Agreement because "to do so would require a much bigger pencil than the legislature envisioned" and it would be "fundamentally unfair to enforce any reformed version of these provisions" because Candice would not have had notice of the scope of the First Agreement. [*Id.* at p. 16]. Integrity states that § 13-8-56(4) applies here and prevents the First Agreement from being overbroad. [Doc. 46, p. 14]. Candice argues that § 13-8-56(4) does not save the First Agreement because its restrictions "extend well beyond what is necessary to 'promote or protect the purpose of subject matter of the agreement or retaliation or deter any potential conflict of interest.'" [Doc. 30, p. 15 n.8]. Therefore, the question is: does § 13-8-56(4) save the First Agreement?

In short, no. Integrity has not pled a specific purpose for the First Agreement. *See*

[Doc. 26, ¶¶ 31–37]. Since the First Agreement is a non-disclosure agreement, the Court must presume its purpose was to protect Integrity's confidential information that Candice may have known. *See* O.C.G.A. § 13-8-54(a). The provisions Integrity claims Candice breached are too broad to "promote or protect" that purpose. Preventing Candice from "solicit[ing] and/or accept[ing] *any* business" or "conduct[ing] *any* transaction with such said sources" is overly broad. [Doc. 26, ¶ 116(a) (emphasis added)]. So is "disclos[ing] or otherwise reveal[ing] *any* contact revealed by either Party to *any* third parties[.]" [*Id.* at ¶ 116(c) (emphasis added)]. Integrity has not established a legitimate business interest in preventing Candice from accepting *any* business or conducting *any* transaction with Integrity's sources, nor has it established a legitimate business interest in preventing Candice from revealing *any* of Integrity's contact information to *any* third party. *See* § 13-8-55. Furthermore, the Court cannot blue pencil the First Agreement to make it enforceable without reforming or rewriting it with new and material terms. *See Brown*, 2025 WL 3125023, at *7. The First Agreement is not enforceable under the GRCA.

For the Second Agreement, Candice makes similar arguments. She argues that the provisions at issue from the Second Agreement are unenforceable because they are "not limited to preventing competition with Plaintiff, the ostensible purpose of NDA 2, or to deterring conflicts of interest." [Doc. 30, p. 17]. Similarly, Integrity argues that § 13-8-56(4) controls. Again, the question turns on whether § 13-8-56(4) saves the Second

Agreement.

Here, the Court finds it does. Once again, Integrity has not pled a specific purpose for the Second Agreement. *See* [Doc. 26, ¶¶ 118–120]. So, the Court presumes its purpose was to protect Integrity's confidential information that Candice may have had access to, and prevent Candice from competing with Integrity. *See* O.C.G.A. § 13-8-54(a). Only one provision Integrity asserts Candice breached is too broad to promote that purpose. That provision is: preventing Candice from "engag[ing] in *any* other professional employment or consulting[.]" [Doc. 26, ¶ 119(a) (emphasis added)]. All other provisions of the Second Agreement that Integrity cites are limited to competing companies or Integrity's current suppliers and customers. *See, e.g.*, [*Id.* at ¶ 119(a) ("with a company that competes, has competed, or intends to compete with Company . . . .")]. Here, the Court can blue pencil the Second Agreement by removing the first part of paragraph 1(a): "will not . . . engage in any other professional employment or consulting[.]" This makes the Second Agreement enforceable at this stage.[11] Therefore, Candice's Motion to Dismiss Integrity's Breach of Contract Claims is **GRANTED as to the First Agreement (Count 7)**, but **DENIED as to the Second Agreement (Count 8)**.

Finally, Candice argues that Integrity's conspiracy claims should be dismissed because "Counts 2, 3, and 4 merely restate claims against Ms. Pence for the underlying

---

[11] The Court does not address the Second Agreement's 12-month provision that extends beyond Candice's employment with Integrity because Integrity has only asserted breaches that occurred during Candice's employment.

offenses in Counts 1, 5, 7, and 8 on an alternative theory of liability," and because a

conspiracy requires a viable underlying cause of action to be valid. [Doc. 30, pp. 19–20].

First, Count 5 is dismissed as preempted by the GTSA. Without the underlying claim,

Integrity's Count 3—Conspiracy for Breach of Fiduciary Duty claim—must also be

**DISMISSED**. *See Iguana, LLC v. Lanham*, 628 F. Supp. 2d 1361, 1370 (M.D. Ga. 2008)

("Without an underlying tort, there is no liability for civil conspiracy.") (citing

*Mustaqeem-Graydon v. SunTrust Bank*, 258 Ga. App. 200, 207 (2002)).

That just leaves Count 4, Conspiracy for Breach of Contract. [Doc. 26, p. 33].

Since Integrity's Breach of Contract Claim is not dismissed for the Second Agreement,

the Court looks to see whether Count 4 "simply restate[s] separate claims against all

defendants for the same underlying offense" as the Breach of Contract claims. [Doc. 30,

p. 19]. It does not. Count 4 alleges an agreement between Candice and Lisa, albeit as a

conclusion, to breach the Agreements and an act in furtherance of their agreement—

establishing and operating P4. [Doc. 26, ¶¶ 106–107]. It is not "merely a restatement of

the claim" in the Breach of Contract counts. *Kitfield v. Henderson, Black & Greene*, 231 Ga.

App. 130, 135 (1998); *compare* [Doc. 26, ¶¶ 105–108], *with* [Doc. 26, ¶¶ 115–120].

However, "[t]hough a conspiracy to breach a contract is actionable, Georgia courts

'have tacitly acknowledged that such an action in conspiracy is essentially the same as

an action for tortious interference with business relations.'" *Osiris Therapeutics, Inc.*

*Plaintiff, v. MiMedx Grp., Inc., Defendant.*, No. 1:19-cv-00857, 2020 WL 11192769, at *4

(N.D. Ga. Feb. 24, 2020) (quoting *Original Appalachian Artworks, Inc. v. Schlaifer Nance &*

*Co.*, 679 F. Supp. 1564, 1573 n.5 (N.D. Ga. 1987)). Therefore, "[t]he Court [**DISMISSES**]

the conspiracy to breach of contract claim for the same reason as the tortious

interference claim." *Id.*

### 2.    Defendants P4 Biologix and Lisa Pence

Before getting to the merits of their arguments, Defendants P4 and Lisa argue

that the Court lacks personal jurisdiction over them and move to dismiss under 12(b)(2).

[Doc. 31]. Specifically, they argue that they have "no connection to Georgia

whatsoever." [Doc. 31-1, p. 1]. To determine whether personal jurisdiction exists, "[a]

federal court sitting in diversity 'must undertake a two-part analysis.'" *ECB USA, Inc. v.*

*Savencia Cheese USA, LLC*, 148 F.4th 1332, 1340 (11th Cir. 2025) (quoting *Sculptchair, Inc.*

*v. Century Arts, Ltd.*, 94 F.3d 623, 628 (11th Cir. 1996)). First, the Court "ask[s] whether

the exercise of personal jurisdiction falls under the state's long-arm statute[.]" *Id.*

Second, the Court determines whether exercise of personal jurisdiction "comports with

the Due Process Clause of the Fourteenth Amendment." *Id.*

The Court looks first to the Georgia long arm statute. Federal courts are required

to construe a state's long arm statute like the state's supreme court. *Diamond Crystal*

*Brands,* 593 F.3d at 1258. The Georgia Supreme Court has made it clear that courts are to

apply the Georgia long arm statute literally, and that Georgia's statute is an inquiry

separate from the due process inquiry. *Id.* at 1254 (citing *Innovative Clinical & Consulting*

*Servs., LLC v. First Nat'l Bank of Ames, Iowa*, S.E.2d 352, 355–56 (Ga. Sup. Ct. 2005)). The statute "imposes independent obligations that a plaintiff must establish for the exercise of personal jurisdiction that are distinct from the demands of procedural due process." *Id.* at 1259. For reference, the Georgia long arm statute provides, in relevant part:

> A court of this state may exercise personal jurisdiction over any nonresident . . . as to a cause of action arising from any of the acts, omissions, ownership, use, or possession enumerated in this Code section, in the same manner as if he or she were a resident of this state, if in person or through an agent, he or she: (1) Transacts any business within this state; (2) Commits a tortious act or omission within this state . . . (3) Commits a tortious injury in this state caused by an act or omission outside this state if the tort-feasor regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state; (4) Owns, uses, or possesses any real property situated within the state[.]

O.C.G.A. § 9-10-91.

Here, Integrity alleged that Lisa is subject to Georgia's long arm statute under (1) and (3) above. [Doc. 26, ¶ 15]. First, out of state defendants are subject to personal jurisdiction in Georgia if they "transact[] any business within this state[.]" O.C.G.A. § 9-10-91(1). Integrity alleges that Lisa contracted with a Georgia-based website designer.[12] [Doc. 47, pp. 8–9]. Such contact is insufficient to constitute transacting business in Georgia. *See Emmer v. WABII Branding Inc.*, No. 1:21-cv-03370-ELR, 2022 WL 22886642,

---

[12] In its response, Integrity consistently lumps P4, Lisa, and, often, Candice into each alleged action. Hiring a Georgia-based website designer is the only specific allegation the Court can find that Lisa personally transacted business in Georgia. The only other allegation for Lisa, specifically, is that "C. Pence, L. Pence, and P4 engaged in a persistent course of business transactions over multiple years *in Georgia*." [Doc. 47, p. 10]. However, for Lisa, such an assertion is unsupported, and amounts to a legal conclusion merely restating an element of Georgia's long arm statute.

at *4 (N.D. Ga. Aug. 8, 2022) ("Contracting with a Georgia resident is insufficient—standing alone—to constitute 'transacting business' for purposes of the Georgia long-arm statute."); *Perrigo Co. v. Merial Ltd.*, 215 F. Supp. 3d 1329, 1340–41 (N.D. Ga. 2016) ("Contracting with a party who itself resides in Georgia for an agreement that is 'governed, interpreted, and construed in accordance with' Georgia law does not alone give rise to a Georgia-based business transaction.").

For the third element, Integrity alleges that Lisa "actively usurp[ed]" its trade secrets; acted in concert with and conspired with Candice to misappropriate trade secrets, breach non-compete agreements, breach fiduciary duties; and built P4's website. [Doc. 26, ¶ 15]. However, Integrity never alleged that Lisa "regularly does or solicits business" in Georgia, as is required under O.C.G.A. § 9-10-91(3).[13] Instead of supporting either argument in its Response, Integrity argues conspiracy jurisdiction. [Doc. 47, p. 4]. The Court discusses conspiracy jurisdiction for both Lisa and P4 below.

For P4, Integrity has not specifically alleged in its Amended Complaint or its response that any of the provisions of Georgia's long arm statute are satisfied. Instead, it alleged the conclusion that P4 is "subject to the personal jurisdiction of this Court pursuant to . . . Georgia's Long-Arm Statute[.]" [Doc. 26, ¶ 13]. Rather than elaborating

---

[13] "Because Plaintiff must, on a Rule 12(b)(2) motion, establish a *prima facie* case of personal jurisdiction to each Defendant, the Court will not consider whether personal jurisdiction exists as to [Lisa and P4] under other sections not argued by Plaintiff." *Data Technology Group, Inc. v. Ranella Consulting, Inc.*, No. 1:24-cv-02657-TRJ, 2025 WL 2884988, at *2 (N.D. Ga. Sept. 18, 2025).

in its Response, Integrity merely states that "Georgia's long-arm statute confers personal jurisdiction over a defendant when the claims arise from the defendant's business transactions in Georgia or the defendant's tortious acts or omissions within Georgia, or when the defendant commits a tortious injury in Georgia by an act or omission outside of the state if the defendant regularly does or solicits business, or engages in any other persistent course of conduct in Georgia." [Doc. 47, pp. 3–4 (internal quotations omitted)]. Integrity does not support this restatement of the law with specific facts or arguments, but instead argues that Georgia recognizes "conspiracy jurisdiction," and that conspiracy jurisdiction applies to both Lisa and P4. [*Id.*].

Therefore, to be clear, the only way either Lisa or P4 are subject to personal jurisdiction in Georgia is through conspiracy jurisdiction. "In Georgia, the in-state acts of a resident co-conspirator may be imputed to a non-resident co-conspirator to satisfy jurisdictional requirements under some circumstances." *Id.* (internal citations omitted). Conspiracy jurisdiction allows an out of state defendant with insufficient minimum contacts for personal jurisdiction to still be haled before a court in Georgia with sufficient contacts based on "an agreement with others who have carried out acts in Georgia." *Sprint Nextel Corp. v. Ace Wholesale, Inc.*, No. 1:12-cv-02902-JEC, 2014 WL 688134, at *7 (N.D. Ga. Feb. 21, 2014). "Under Georgia law, the essential element of the alleged conspiracy is proof of a common design establishing that two or more persons in any manner, either positively or tacitly, arrive at a mutual understanding as to how

they will accomplish an unlawful design." *Id.* (internal citations omitted). "If the non-resident defendant refutes the conspiracy allegations, the plaintiff must produce evidence to establish it." *Cold Smoke Cap., LLC v. Gross*, No. 1:11-cv-3558-WSD, 2012 WL 3612626, at *6 (N.D. Ga. Aug. 21, 2012). Finally, "without an underlying tort . . . there is no liability for civil conspiracy." *Ralls Corp. v. Huerfano River Wind, LLC*, 27 F. Supp. 3d 1303, 1334 (N.D. Ga. 2014) (citing *Miller v. Lomax*, 596 S.E.2d 232, 242 (Ga. Ct. App. 2004)).

Here, all conspiracy claims have been dismissed. "Therefore, the Court can't exercise personal jurisdiction based on such a theory when there is no longer an alleged conspiracy in the action." *Robinson v. McNeese*, No. 5:20-cv-00160-TES, 2020 WL 6566174, at *9 (M.D. Ga. Nov. 9, 2020). Accordingly, the Court **GRANTS** Lisa and P4's Motion to Dismiss. [Doc. 31].

## CONCLUSION

In sum, the Court **DISMISSES** Counts 2, 3, 4, 5, 7, 9, and 10. The Court **DENIES** Candice's Motion to Dismiss as to Counts 1 and 8 against her,[14] and **GRANTS** P4 and Lisa's Motion to Dismiss for lack of personal jurisdiction.

**SO ORDERED**, this 16th day of December, 2025.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**

---

[14] The Court notes that there is no Count 6 in Integrity's Amended Complaint. [Doc. 26, pp. 33–36].